468 So.2d 955 (1985)
Leila CARTER, Mother and Natural Guardian of Charles Durham, a Minor, Petitioner,
v.
CITY OF STUART and Aetna Casualty & Surety Company, Respondents.
No. 64001.
Supreme Court of Florida.
April 4, 1985.
Vicki J. Junod of Gamba, Junod & Schott, Palm City, for petitioner.
Everett J. Van Gaasbeck of Moss, Henderson & Lloyd, Vero Beach, and Marjorie Gadarian Graham of Jones & Foster, West Palm Beach, for respondents.
James R. Wolf, Gen. Counsel, and Harry Morrison, Jr., Asst. Gen. Counsel, Tallahassee, *956 amicus curiae for the Florida League of Cities, Inc.
McDONALD, Justice.
Responding to a certified question from the Fourth District Court of Appeal,[1] we answer the question: "Can a city be held liable for the failure to enforce its animal control ordinance?"[2] Within the factual context of the case before us we hold that it cannot.
Leila Carter sued the City of Stuart to recover damages suffered when a dog which had escaped its confinement on private property within the city attacked and severely injured her minor child, Charles Durham. Carter based her action against the city primarily upon the city's failure to enforce its ordinance requiring impoundment of both dangerous dogs found running at large and dogs that had bitten people. She alleged that the city impoundment officer should have impounded the dog after prior incidents of biting. The trial court entered a final summary judgment for the city, finding that enforcement of the dog control ordinance constituted a planning level governmental decision immune from tort liability under Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979). The district court affirmed, finding the failure to enforce this dog control ordinance equivalent to the failure to enforce an ordinance limiting hedge and shrub height at intersections, which had been held immune from liability in Elliott v. City of Hollywood, 399 So.2d 507 (Fla. 4th DCA 1981).
The decision of the district court is consistent with our pronouncements in Commercial Carrier. In that opinion this Court found that certain policy-making, planning, or judgmental governmental functions cannot be the subject of traditional tort liability. Recognizing that the act of governing covers myriad factors and considerations, we upheld the principle that governmental entities must be free to make policy, planning, or judgmental decisions without fear of tort liability. After referring to certain precedents from other states, we said:
So we, too, hold that although section 768.28 evinces the intent of our legislature to waive sovereign immunity on a broad basis, nevertheless, certain "discretionary" governmental functions remain immune from tort liability. This is so because certain functions of coordinate branches of government may not be subjected to scrutiny by judge or jury as to the wisdom of their performance.

371 So.2d at 1022 (emphasis supplied).
To determine whether a specific act or omission is immune, we then adopted a planning level/operational level analysis in Johnson v. State, 69 Cal.2d 782, 73 Cal. Rptr. 240, 447 P.2d 352 (1968). Planning level functions under Johnson require basic policy decisions and are immune from liability. Operational level functions, on the other hand, merely implement predetermined policy and may subject the governmental entity to tort liability. Applying the Johnson test to the facts in Commercial Carrier, we held that the maintenance of traffic-control devices fell in the operational level category, which could provide a basis for liability. We revisited this issue in Department of Transportation v. Neilson, 419 So.2d 1071 (Fla. 1982), and held that the initial decisions regarding the installation and placement of traffic-control devices are planning level decisions and, therefore, immune from liability as exercises of the government's police power, but that failure to warn of a danger is not.
This Court decided Wong v. City of Miami, 237 So.2d 132 (Fla. 1970), before the enactment of section 768.28. Nevertheless, Wong's holding denying liability because of the strategy the city employed in use of its *957 police force is a clear illustration of nonactionable activity because "inherent in the right to exercise police powers is the right to determine strategy and tactics for the deployment of those powers." Id. at 134.
A government must have the flexibility to set enforcement priorities on its police power ordinances in line with its budgetary constraints. Without the ability to make such choices a government must either pay the high cost of total enforcement or forego the exercise of its police power. Neither option serves the public interest.
Deciding which laws are proper and should be enacted is a legislative function. How and in what manner those laws are enforced is, in most instances, a judgmental decision of the executive branch. The judicial branch should not trespass into the decisional process of either.
Turning to this case, we conclude the city had no liability. The amount of resources and personnel to be committed to the enforcement of this ordinance was a policy decision of the city. The city has the right to set its priorities in reference to law enforcement. One of its employees had previously responded to a complaint concerning several dogs including the dog which ultimately bit Carter's child.[3] When responding to this complaint, this employee observed none of the complained-of dogs off of private property and had no independent knowledge of which dog had previously bitten a person. He had to decide whether to trespass on private property and which dogs he should impound if he did.[4] He too made a judgmental decision on behalf of the city which should be immune.
Carter argues that there should be liability here because the circumstances left no room for discretion. The facts are clear that this contention cannot stand. This argument, however, does require our pausing short of saying that in no circumstances may a governmental unit be subjected to liability for the failure to enforce its laws. There may be some compelling circumstances, where there is no room for the exercise of discretion, which mandate action because it is clear that a government's failure to act has caused a breach of duty. Where, if ever, such a situation exists will have to await another claim on another occasion.
The decision of the district court is approved.
It is so ordered.
BOYD, C.J., and OVERTON and ALDERMAN, JJ., concur.
EHRLICH, J., concurs with an opinion.
SHAW, J., dissents with an opinion with which ADKINS, J., concurs.
EHRLICH, Justice, concurring.
I concur in the majority opinion as limited to the facts of this case. The employee responding to the complaint saw no violation of the ordinance. He therefore could not be in breach of his duty to enforce the ordinance.
The next allegation is that he was under a duty to investigate the complaint further, having discovered no immediate grounds for the complaint. This decision involves the strategic allocation of government services which is a quintessential government planning function which is shielded by sovereign immunity.
I write further to address Judge Letts's trenchantly expressed frustration with the lack of a bright line in the delineation of governmental operational and planning functions for purposes of determining sovereign immunity. We recognize that there is no one clear test, applicable to all fact *958 patterns, by which a trial court, or even an appellate court, may separate immune planning-level functions from those areas of negligent operational procedure for which the state has accepted tort liability. This problem is inherent in the nature of the beast: torts come in all shapes and sizes; beyond the hornbook formula of duty, breach of duty, proximate cause and damage, the facts giving rise to claims against the state cover the broadest spectrum of tort liability. The legal adage that hard cases make bad law is never more true than when a court attempts, on a particular set of facts, to resolve all controversy in an entire field of law.
The development of the law of sovereign immunity in Florida has, since the passage of section 768.28, followed the usual pattern of common law development. As a new set of facts arises, the courts apply the general principles set forth in the statutes and in earlier constructions thereof to those facts. If that creates the temporary illusion that the case law is "in disarray," such is the nature of the common law, which does not set out to answer broad questions when narrow issues are presented. We can only commend to the district courts the yeomanlike shouldering of their appellate duty to wrestle with each specific fact pattern to help to fashion a body of law which will, when complete, reveal an orderly disposition of cases. The difficulty is inherent. We will not achieve the ends of justice by fashioning a facile, but inequitable, rule.
I write the foregoing will full knowledge that the majority of the Court has placed a construction on section 768.28 in the cases of Trianon Park Condominium Association v. City of Hialeah, 468 So.2d 912 (Fla. 1985); Everton v. Willard, 468 So.2d 936 (Fla. 1985); Duvall v. City of Cape Coral, 468 So.2d 961 (Fla. 1985); Rodriguez v. City of Cape Coral, 468 So.2d 963 (Fla. 1985); City of Daytona Beach v. Huhn, 468 So.2d 963 (Fla. 1985); City of Daytona Beach v. Palmer, 469 So.2d 121 (Fla. 1985); Reddish v. Smith, 468 So.2d 929 (Fla. 1985) with which I disagree and from which decisions I have dissented. The "bright line" which may emerge from those cases is not one that will carry out the legislative intent of section 768.28, in my opinion, and is certainly not one that I would have drawn. Nonetheless, that is a common law process to which I wholeheartedly subscribe. Hopefully, the latest efforts of the Court will not obfuscate but will clarify the law.
SHAW, Justice, dissenting.
My views on the broad question of the waiver of sovereign immunity under article X, section 13, Florida Constitution, and section 768.28, Florida Statutes (Supp. 1974), are set forth at length in my dissents in Everton v. Willard, 468 So.2d 936 (Fla. 1985); Trianon Park Condominium Association v. City of Hialeah, 468 So.2d 912 (Fla. 1985); Duvall v. City of Cape Coral, 468 So.2d 961 (Fla. 1985); and Reddish v. Smith, 468 So.2d 929 (Fla. 1985). My comments on this particular case will be comparatively brief.
The majority opinion relies on the ubiquitous but amorphous tool of public policy to conclude that government entities may not be held liable for discretionary torts because this would chill the decision-making process and frustrate governance. The view that it is necessary as a matter of public policy for government units to be immune from liability for discretionary torts is not only contrary to the fundamental concept of a constitutional democracy which places curbs on government actions, but it is specifically contrary to article X, section 13 and section 768.28. Article X, section 13 unequivocally states that "[p]rovisions may be made by general law for bringing suit against the state... ." As it was constitutionally authorized to do, the legislature implemented this provision by providing in pertinent part that the state, its agencies or political subdivisions, will be liable for torts "caused by the negligent or wrongful act or omission of any employee ... while acting within the scope of his office or employment under circumstances in which the state or such agency or subdivision, if a private person, would be liable *959 to the claimant, in accordance with the general laws of this state." § 768.28(1).
The legislature has determined what the public policy will be regarding tort suits against the state: tort victims of government acts will be compensated by the offending government unit. In addition to compensating victims, tort suits serve two subordinate but vital purposes. First, they serve to discourage anti-social behavior on the part of the tortfeasor and potential tortfeasors. As Prosser put it:
The "prophylatic" factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer. When the decisions of the courts become known, and defendants realize that they may be held liable, there is of course a strong incentive to prevent the occurrence of the harm. Not infrequently one reason for imposing liability is the deliberate purpose of providing that incentive. The rule of vicarious liability is intended, among other things, to result in greater care in the selection and instruction of servants than would otherwise be the case; the carrier which is held to the "highest practicable degree of care" toward its passengers will tend to observe it for their safety; the manufacturer who is made liable to the consumer for defects in his product will do what can be done to see that there are no such defects. While the idea of prevention is seldom controlling, it very often has weight as a reason for holding the defendant responsible.
Prosser and Keeton, The Law of Torts § 4 at 25-26 (5th ed. 1984) (footnotes omitted). See also Williams, The Aims of the Law of Tort, 4 Current Legal Probs. 137 (1951).
The second subordinate purpose is closely allied to the first, but with particular emphasis on the fact that the alleged tortfeasor is a government unit. Government units are agents of the public established to carry out public business. A tort suit, where facts are established, opens up the activities of government to public scrutiny and permits the public to make informed decisions about the conduct and efficiency of its agents. Governmental liability for tortious activity is an important part of the movement to open up government and make it responsive to the public. I consider it significant that the legislative waiver of sovereign immunity was enacted in the same time period, late 1960s and 1970s, as other measures opening up the government to public scrutiny and making it more responsive. See article II, section 8, Florida Constitution (Ethics in Government, adopted 1976, requiring full and public disclosure of financial interests by public officers, candidates for public offices, and public employees); chapter 119, Florida Statutes (numerous enactments strengthening access to public records); chapter 120, Florida Statutes (Administrative Procedures Act written to open up administrative agencies to public view and access); chapter 286, Florida Statutes (various sections concerning public meetings, records, and disclosures strengthened). All of these measures place a burden on government which undoubtedly "chills" certain discretionary activities. This is not surprising nor undesirable since they are intended to monitor and curb government actions.
The philosophical argument that "government can't operate" without relief from the legislative waiver of sovereign immunity is the same argument that we have consistently rejected when it was advanced as a reason for relief from the legislative decision that public records and meetings will be open. Neu v. Miami Herald, 462 So.2d 821 (Fla. 1985); Tribune Co. v. Cannella, 458 So.2d 1075 (Fla. 1984); Wood v. Marston, 442 So.2d 934 (Fla. 1983); Wait v. Florida Power & Light Co., 372 So.2d 420 (Fla. 1979); City of Miami Beach v. Berns, 245 So.2d 38 (Fla. 1971); and Board of Public Instruction v. Doran, 224 So.2d 693 (Fla. 1969).
As I attempted to show in my dissent to Everton, section 768.28, as amended, is a well-crafted and closely thought out method of dealing with the public policy question of whether there should or should not *960 be governmental immunity. Even if it were not so well-crafted, this Court has no constitutional power to substitute its public policy judgment for that of the legislature. Further, there is no rule of statutory construction whereby this Court is empowered to stand section 768.28 on its head by reading into the statute an exemption from suit for discretionary functions. On the contrary, the legislative history of the waiver of sovereign immunity indicates that the legislature did not intend to exempt discretionary activities. Section 768.15, Florida Statutes (1969), the predecessor to section 768.28, waived sovereign immunity but specifically provided that no action could be brought if the claim
(a) Arises out of the performance or the failure to perform a discretionary function;

(b) Arises out of a riot, unlawful assembly, public demonstration, mob violence, or civil disturbance;
(c) Arises out of the issuance, denial, suspension, or revocation of, or by the failure to issue, deny, suspend, or revoke, a permit license, certificate, approval, order, or similar authorization; or
(d) Arises out of the collection or assessment of taxes. (Emphasis supplied.)
Chapter 69-357, section 1, Laws of Florida, repealed section 768.15 effective 1 July 1970. When the legislature reenacted the waiver of sovereign immunity in 1973, it chose to exempt only actions arising from riot, unlawful assembly, public demonstration, mob violence, or civil disturbance. It chose not to reenact the exemption for discretionary functions. Ch. 73-313, § 13, Laws of Fla. With this legislative history and on the plain language of the statute, I find it difficult to rationally argue that the legislature intended to include an exemption for discretionary activities. This Court's creation of a discretionary exemption is directly contrary to legislative intent and, to a large extent, nullifies the statutory waiver of sovereign immunity.
Aside from disagreeing philosophically with the majority opinion, I encounter a more practical problem occasioned by the fact that this case comes to us as a summary judgment grounded on the sovereign immunity of the city. In order to get a clean shot at the certified question, the majority finds that "Carter based her action against the city primarily upon the city's failure to enforce its ordinance requiring impoundment of both dangerous dogs found running at large and dogs that have bitten people." With the issue thus focused, the majority reaches the conclusion that the dogcatcher "made a judgmental decision on behalf of the city which should be immune... ." It is, however, conceded that "[t]here may be some compelling circumstance, where there is no room for the exercise of discretion, which mandate action because it is clear that the government's failure to act has caused a breach of duty. Where, if ever, such a situation exists will have to await another claim on another occasion."
Factually, the petitioner's complaint did not merely allege that the city failed to enforce an ordinance; it alleged specifically that the city actually took custody of the vicious pit bull following a previous attack, but carelessly and negligently released the dog without taking any action to prevent future acts. This is a different factual situation from that the majority postulates. I suggest that the city does not have discretional immunity to release a known vicious dog on the public, or to put it more positively, the city has a duty not to knowingly release vicious dogs on the public. See Restatement (Second) of Torts section 319 (1965), which refers to persons with dangerous propensities but is equally apt regarding animals with dangerous propensities:
Duty of Those in Charge of Person Having Dangerous Propensities  One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.
*961 The majority opinion also confuses the relationship between tort duty and sovereign immunity. Duty, or lack thereof, is a question of general tort law; it has nothing to do with separation of powers and sovereign immunity. Conversely, sovereign immunity from suit does not rest on an absence of duty, but is based on the theory that the sovereign cannot be sued for certain tortious acts, period. If a government unit is truly immune from suit on the basis of sovereign immunity, traditional tort principles are irrelevant.
For the reasons expressed above, I would quash the district court decision and remand for jury trial applying traditional tort principles.
ADKINS, J., concurs.
NOTES
[1] Carter v. City of Stuart, 433 So.2d 669 (Fla. 4th DCA 1983).
[2] The district court framed the question as: "Is a city's failure to enforce a valid ordinance a planning decision as opposed to an operational one?" 433 So.2d at 670. We choose to rephrase and narrow the question.
[3] The person bitten by a dog has a cause of action against the owner of the dog. § 767.04, Fla. Stat. (1983).
[4] He decided to take no action. In doing so he exercised his discretion considering whether the ordinance had been violated, who violated it, and what should be done. The fact that a low echelon employee made such a decision does not detract from the fact that it was a reasoned judgmental decision of the city. We should not second-guess it.