529 So.2d 258 (1988)
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Petitioner,
v.
Stella YAMUNI, As Adoptive Mother, Next Friend and Guardian of Sean Yamuni a Minor, Respondent.
No. 69602.
Supreme Court of Florida.
June 2, 1988.
Rehearing Denied August 26, 1988.
*259 Joan S. Buckley and Douglas H. Stein of Walton, Lantaff, Schroeder & Carson, Miami, for petitioner.
Ralph O. Anderson of Daniels & Hicks, P.A., Miami, and George, Hartz & Lundeen, P.A., Miami, for respondent.
SHAW, Justice.
We review State of Florida, Department of Health and Rehabilitative Services v. Yamuni, 498 So.2d 441 (Fla. 3d DCA 1986), to answer a certified question of great public importance.
Has the State of Florida, pursuant to section 768.28, Florida Statutes (1983), waived sovereign immunity for liability arising out of the negligent conduct of an HRS case worker?
Id. at 444. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.
Briefly stated, the facts of this case are that during the period December 1979 to August 1980, the Department of Health and Rehabilitative Services (HRS) received numerous reports that an infant, Sean Yamuni, was being physically abused. The department investigated, but the infant was allowed to remain in the custody of its natural mother and HRS failed to place the infant under protective supervision as it was directed to do by court order in January 1980. In August 1980, Sean was admitted to a hospital with severe burns and two fractures to his arm. The arm was medically amputated the following day. The jury found HRS guilty of negligence and returned a verdict of 3.1 million dollars which was reduced to $50,000 pursuant to section 768.28(5), Florida Statutes (1979). The district court affirmed, holding that HRS had a statutory and common-law duty to Sean and that there was no sovereign immunity shielding the HRS case-worker's operational level activities. We agree and approve the decision below.
The HRS presents two issues for our consideration. The threshold issue is whether the actions of its caseworkers were planning level activities which were sovereignly immune under Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979). In Commercial Carrier, we recognized the broad scope of the legislative waiver of sovereign immunity in section 768.28, Florida Statutes (1975), but nevertheless carved out an exception to the waiver not contained in the statute for "policy-making, planning or judgmental government functions." Id. at 1020. We recognized that identification of these immune functions would be difficult and adopted a case-by-case method of identifying these functions based on Evangelical United Brethren Church v. State, 67 Wash.2d 246, 407 P.2d 440 (1965), and Johnson v. State, 69 Cal.2d 782, 73 Cal. Rptr. 240, 447 P.2d 352 (1968). We adopted a test from Evangelical consisting of four preliminary questions:
(1) Does the challenged act, omission, or decision necessarily involve a basic governmental *260 policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved. (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision.
Under Commercial Carrier, if these preliminary questions can be clearly and unequivocally answered yes, then the challenged act is probably policy-making, planning, or judgmental activity which is immune from tort liability. If the answer to any of the questions is no, the activity is probably operational level which is not immune. In either case, further examination is required using the Johnson analysis.
Applying the Evangelical questions to the case at hand, only number four can be clearly and unequivocally answered yes.[1] As the district court held, these negative answers indicate that the caseworker actions do not rise to the level of basic policy making which is a prerequisite to immunity under Commercial Carrier. The HRS nevertheless argues that the caseworkers were exercising discretion in handling the reported child abuse and that their actions were planning level activity under Commercial Carrier. This argument is grounded on the definitional approach to "discretion" which we, and the Johnson court, rejected because "all governmental functions, no matter how seemingly ministerial, can be characterized as embracing the exercise of some discretion in the manner of their performance." 371 So.2d at 1021. We have no doubt that the HRS caseworkers exercised discretion in the dictionary or English sense of the word, but discretion in the Commercial Carrier sense refers to discretion at the policy making or planning level. We agree with the district court that the actions of caseworkers investigating and responding to reports of child abuse simply cannot be elevated to the level of policy-making or planning. To accept the HRS argument would require that we recede from Commercial Carrier by negating any meaningful distinction between operational and planning level activity. We firmly rejected this argument in Commercial Carrier and decline to recede therefrom. We hold that the caseworker activities were operational level for which there is a waiver of immunity. We answer the certified question with a qualified no, noting that we adopted a case-by-case approach in Commercial Carrier and it is at least theoretically conceivable, although pragmatically unlikely, that some action of a caseworker might rise to the level of basic policy making. We acknowledged in Commercial Carrier and acknowledge again, that the case-by-case approach is difficult to apply. It requires minute examination of the alleged negligent actions of the government unit to determine if they are operational or planning level as each case comes to court.
The HRS also argues that its activities here were exclusively governmental and are not performed by private persons. Therefore, HRS reasons that there has been no waiver of sovereign immunity because section 768.28(1) only waives immunity "under circumstances in which the state or such agency or subdivision, if a private person, would be liable." (Emphasis supplied.) This reasoning was presented and rejected in Commercial Carrier because to accept it "would be to essentially emasculate the [waiver of immunity] and the salutory purpose it was intended to serve." 371 So.2d at 1017. The HRS argues that we used language in Reddish v. Smith, 468 So.2d 929, 932 (Fla. 1985), which indicates *261 the we now accept this reasoning. We agree that the language in Reddish is contrary to Commercial Carrier. We note, however, that this argument was not in fact presented by the parties in Reddish and that we gave no indication we were receding from the contrary Commercial Carrier holding. Moreover, Reddish was decided on the basis of the Commercial Carrier criteria and our contradictory statements were dicta. We recede from any suggestion in Reddish that there has been no waiver of immunity for activities performed only by the government and not private persons. The only government activities for which there is no waiver of immunity are basic policy making decisions at the planning level. Commercial Carrier.[2]
The HRS next argues that it has no legal duty to protect children from abuse and, thus, as a matter of law, cannot be held liable for negligence in failing to prevent the injuries to the infant Sean. In support, HRS offers a number of points. First, it argues, HRS was exercising the police power in enforcing the law and protecting the public safety, which activity falls within category II of Trianon Park Condominium Association v. City of Hialeah, 468 So.2d 912, 919 (Fla. 1985), and for which there is immunity and no duty of care. This argument is apparently grounded on the view that HRS's primary role in child abuse cases is to identify child abusers for prosecution much as a police department would do. We will have more to say on the HRS role but, for now, we agree with the district court below that the HRS child abuse role is to provide professional, educational, and general services for the health and welfare of citizens. These activities fall within category IV of Trianon for which there is a waiver of immunity and a duty of care. Moreover, the categories set out in Trianon offer only a rough guide to the type of activities which are either immune or not immune. The test for determining immunity, and for determining which category the activity falls into, is still Commercial Carrier's operational versus planning dichotomy. We have determined above that the activities here were operational and nothing in Trianon changes that result.
The HRS also argues that it has no statutory duty under chapter 827, Florida Statutes (1979), to prevent further injuries to abused children after reports of such abuse are received and, further, that section 827.07(7) statutorily immunizes HRS from liability. As we indicated above, it seems clear that HRS is being excessively modest concerning the importance of its role in preventing child abuse. The HRS is not merely a police agency and its relationship with an abused child is far more than that of a police agency to the victim of a crime. Chapter 827 designates children as a protected class of persons and requires that all other persons with knowledge or suspicion of child abuse report such abuse to HRS. Failure to so report is a criminal offense under section 827.07(18). The HRS is assigned the responsibility or duty to provide "ongoing protective ... services to, and on behalf of, children in need of protection to safeguard their well-being." § 827.07(11)(a)4. This duty is reinforced by the statement of legislative intent that reports of abused or neglected children be made to HRS in order "to prevent further harm to the child." § 827.07(1). This duty is further reinforced by the specific requirements for conducting child protective investigations in section 827.07(10). It is clear from these various provisions of law that the primary duty of HRS is to immediately prevent any further harm to the child and that the relationship established between HRS and the abused child is a very special one. We agree with the district court below that HRS has a statutory duty of care to prevent further harm to children when reports of child abuse are received. The record here illustrates the practical application of the legislative scheme and *262 the facts on which the jury based its verdict of HRS negligence. Relatives of the infant and the police reported the alleged abuse to HRS, as they were legally required to do, and all concerned looked to and relied on HRS to perform its statutory duty of preventing further abuse.[3] Moreover, the record also shows that a court order was entered releasing Sean to his natural mother pending further investigation by HRS, and that the mother had agreed to protective supervision by HRS. The HRS concedes that because of an internal breakdown, it closed the case without assigning it to the protective supervision unit and that the court order was not carried out. Under these circumstances and given the plain meaning of chapter 827, we do not see how HRS can seriously argue that it did not have a duty of care. Whether HRS was actually negligent was a jury question and we are satisfied that the record supports the jury verdict.
In a variation of the duty argument above, HRS also argues that even if it violated its duty of care, section 827.07(7) statutorily immunizes it from liability. We do not agree. To so read section 827.07(7) would turn chapter 827 on its head by protecting the legal protector (HRS) from the protected class. Section 827.07(7) protects against liability for carrying out the protective measures of chapter 827 on behalf of the protected class, it does not protect against failing to carry out the protective measures.
We approve the decision below and answer the certified question as set forth herein.
It is so ordered.
EHRLICH, BARKETT and KOGAN, JJ., concur.
McDONALD, C.J., dissents with an opinion, in which OVERTON and GRIMES, JJ., concur.
OVERTON, J., dissents with an opinion, in which McDONALD, C.J. and GRIMES, J., concur.
GRIMES, J., dissents with an opinion, in which OVERTON, J., concurs.
McDONALD, Chief Justice, dissenting.
The Department of Health and Rehabilitative Services has an awesome responsibility in its duties relative to claims of child abuse. Evaluating the natural rights and responsibilities of parents is an exacting task. It requires a great deal of judgmental and decision-making action. HRS' actions, in this area, are entirely governmental. I do not believe that the judicial branch of government can pass judgment on these decision-making processes. Sovereign immunity was modified by section 768.28, Florida Statutes, to allow actions for proprietary actions by governmental agencies, that is, for a type of acts that a private citizen or corporation performs. It was not enacted to exact, or allow, damages for the negligent performance of those duties unique to governmental agencies. I thought we had made that quite clear in Trianon Park Condominium Association v. City of Hialeah, 468 So.2d 912 (Fla. 1985). Today we seemingly retreat from that concept.
I join Justice Grimes in suggesting that the legislature should review its waiver of sovereign immunity provisions.
OVERTON and GRIMES, JJ., concur.
OVERTON, Justice, dissenting.
I fully agree with Justice Grimes' dissenting opinion.
Under the majority opinion, the State of Florida is now liable for damages for failing to continue to investigate for child abuse under a voluntary supervision agreement *263 even after all known claims have been investigated and found inadequate to establish such abuse. The thrust of respondent's claim, however, as noted in the briefs and during oral argument, is that HRS failed to discover sufficient grounds to take custody of the child away from the natural mother. The taking of a child from a natural parent is solely a police power function. It is clearly a function that only government can exercise and, even when it does so, the government's exercise of this power has strict constitutional limitations, including the right to counsel for natural parents. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); In Interest of R.W., 495 So.2d 133 (Fla. 1986); In Interest of D.B., 385 So.2d 83 (Fla. 1980).
The record in this case reveals that the only acts of child abuse which would have enabled HRS to successfully file a dependency petition apparently occurred out of state approximately two months prior to the critical injury, and, although known by the complaining members of the family, were not reported to HRS. I find the majority's statement that "HRS failed to place the child under protective supervision as it was directed to do by court order in January, 1980," an improper characterization of the facts. The record clearly establishes that: (1) there was never a judicial determination of child abuse; (2) HRS was not awarded actual or constructive custody of the child; (3) there was no judicial determination that the child was a dependent child under section 39.401, Florida Statutes (1985); and (4) there was never a performance agreement entered into as permitted by section 409.168, Florida Statutes (1985), upon a finding of dependency. There was only a judicial recognition that the mother had voluntarily agreed to HRS supervision and directions to release the child to the natural mother pending further investigation.
Because it was not contained in the majority opinion, I find it necessary to set forth a chronological history of the facts of this case: In December, 1979, Desiree McAnnis, Sean's mother, informed her mother, Stella Yamuni, that she was moving into the home of Mark Levitt. Also living in Levitt's home were his ex-wife, Deborah, and Levitt's younger son.
On December 22, 1979, Eugene McKnight, Stella's brother-in-law, phoned HRS and reported that Sean had punctures on his feet from needles and bruises over his left eyebrow and right ear, and that he suspected the abuser was Mark Levitt. The HRS investigator asked the police to visit Levitt's house and check on the child's safety. After the home visit, the officer told the HRS investigator that he had seen Sean, that the child appeared to be fine, that he had a scrape on the bottom of his foot but did not have any bruises. The officer further reported that the child's mother was not drugged or alcohol-intoxicated, and that the officer did not see any reason for concern about the child's immediate safety.
On December 25, 1979, Stella called HRS and reported that Sean had small black spots that appeared to be puncture wounds on the bottom of his left foot. She also reported that she believed Levitt and her daughter used drugs. At the time Stella made the report, Sean was at Eugene McKnight's home. As a result, Sean, at the direction of HRS, was picked up by police and brought to an HRS office. There, the detective observed that Sean had marks on his foot and did not respond to the officer's presence. The detective advised the investigating counselor that he could not make an arrest for child abuse because "in this case it wasn't something that I could prove that night to be able to arrest somebody." Sean was then taken to Jackson Memorial Hospital late on Christmas day, where he was examined by the child protection team. He was alert and smiling; the physician who examined him could not distinguish whether Sean's condition was caused by actual pin-pricks or by contact with prickers from a brush or plant, as Sean's mother contended. The counselor decided to detain Sean for Christmas day.
Eugene McKnight later met with an HRS official, stating he wanted the State of Florida to take Sean away from his *264 mother. The officer asked McKnight if he had any witnesses to child abuse and McKnight said no. The investigating HRS officer had Sean brought to her office, where she observed no signs of child abuse at that time. She also had Sean examined by the medical doctor who had been the child's pediatrician since birth. From his examination on December 25, the pediatrician told the HRS investigator there were no signs of abuse and claimed he had never seen any signs of child abuse to Sean. He further stated he found nothing on the child's foot except "possibly some splinters," and that the inference the marks were from needles was "ridiculous." The HRS officer concluded there were no grounds for a detention petition. This conclusion was also reached by an assistant state attorney who testified, "It was my feeling we did not have enough evidence to reach even the threshold standard for filing a dependency petition." The assistant state attorney had also spoken to the doctor who was head of the child protection team at Jackson Memorial Hospital, who indicated to him there was no medical evidence the child had been physically abused, and that she felt the injury to Sean's foot was not from abuse. The state attorney later testified there was insufficient evidence for HRS to file a dependency petition.
On December 26, the assigned judge rendered the following:
The Court heard from those present and finds said child's mother had agreed to have said child examined by a pediatrician and also voluntarily submit to supervision by Health and Rehabilitative Services.
It is thereupon ORDERED AND ADJUDGED that said child is hereby released to the custody of his mother pending further investigation in this case.
The order was filed on January 17, 1980. There was no finding of child abuse, nor was there any dependency finding.
On January 5, 1980, HRS received an anonymous call stating that Sean had strap marks on his feet and was constantly sedated, and also reporting a high level of drug activity at Levitt's home. An HRS intake counselor investigated, found that Levitt's home was in an expensive neighborhood, was neat and well cared for, and concluded there were no visible signs of drug involvement. Neither Desiree nor Sean was present at the time.
On January 7, 1980, Stella called HRS to report that her daughter had been beaten and that Sean's face and eyes were swollen. An HRS investigator later visited Desiree and Sean at Stella's home. The investigator saw Sean, and reported that his eyes were red, which his mother explained as an allergic reaction to eyedrops prescribed two days earlier. Desiree admitted that Levitt had beaten her, but denied that he had mistreated Sean. Desiree stated that she was going to remain with her mother.
On March 31, 1980, McKnight called HRS to report that Sean was residing with his great-grandmother, a Mrs. Mesa. McKnight stated that on one occasion when Desiree returned Sean to Mrs. Mesa the child was bruised. McKnight told the investigator he would have Sean checked by a private physician and would call with the results. He also advised the investigator that the child would be remaining with Mrs. Mesa. Later, McKnight brought Sean to HRS, where an investigating counselor noticed a bruise under one of the child's eyes. The investigator's report stated that the child had been taken to the family doctor, who could not confirm abuse and said the bruise could have been the result of a fall.
On April 3, 1980, Stella took Sean to Guatemala where they remained until June 3, 1980.
On June 3, 1980, when Stella returned, she was met at the airport by her daughter, Desiree, and Levitt, who took Sean and said they would return to pick her up. Instead, they left Stella stranded at the airport and apparently took Sean to Georgia. On June 4, 1980, Stella reported these events to HRS. The whereabouts of Desiree, Levitt, and Sean were unknown. An HRS investigator determined that Levitt's *265 home was empty and the phone had been disconnected.
At the end of June, Desiree went to her father's house with Sean. Desiree had been beaten and Sean had cigarette burns on his arms and foot. Desiree promised her mother she would have nothing more to do with Levitt and agreed to take Sean to Guatemala. This incident was never reported to HRS.
On July 20, 1980, Desiree, Sean, and Mrs. Mesa went to Guatemala where they remained until August 8, 1980.
On August 8, 1980, Desiree and Sean returned to Miami and to Levitt. HRS was not notified of their return.
On August 18, 1980, Sean was taken to Jackson Memorial Hospital by Deborah Levitt. Sean had two complete fractures to his right forearm and severe burns. As a result of those injuries and the delay in seeking medical care, Sean's right forearm was amputated on August 19, 1980.
The respondent's complaint claims that HRS had a duty to properly investigate and handle all child abuse referrals. It is important to note that the only adequate, unrefuted evidence of physical abuse justifying a dependency finding occurred in June, 1980, when Desiree and Sean returned to Desiree's father's home. On that occasion, although known by the complaining members of the family, the injuries were not reported to HRS. Until that time, HRS had investigated every complaint of child abuse brought to their attention. On each of these occasions, based upon opinions of physicians, other health care professionals, and assistant state attorneys, the evidence was determined insufficient to establish child abuse or to meet the threshold necessary for a dependency petition.
I find no violation of any statutory duty for the failure of HRS to discover the events that occurred in the latter part of June, 1980. In fact, although the majority discusses chapter 827, that statute would apply only if the state had actual or constructive custody of the child. I see this case no differently than multiple cases dealing with police power, discretionary function activities for which no liability has been found. City of Daytona Beach v. Palmer, 469 So.2d 121 (Fla. 1985) (decisions of firefighters in combatting a fire); Rodriguez v. City of Cape Coral, 468 So.2d 963 (Fla. 1985) (decision to take person into custody); City of Daytona Beach v. Huhn, 468 So.2d 963 (Fla. 1985) (decision to make an arrest); Carter v. City of Stuart, 468 So.2d 955 (Fla. 1985) (enforcement of dog catcher ordinance); Reddish v. Smith, 468 So.2d 929 (Fla. 1985) (prisoner classification); Duvall v. City of Cape Coral, 468 So.2d 961 (Fla. 1985) (enforcement of drunkdriving statute); Everton v. Willard, 468 So.2d 936 (Fla. 1985) (decision to make arrest); Wong v. City of Miami, 237 So.2d 132 (Fla. 1970) (provision of police protection); McFadden v. County of Orange, 499 So.2d 920 (Fla. 5th DCA 1986) (police decisions regarding traffic control methods and devices); Dietrick v. Department of Highway Safety and Motor Vehicles, 496 So.2d 212 (Fla. 5th DCA 1986) (issuing drivers' licenses); Bob's Pawn Shop, Inc. v. City of Largo, 488 So.2d 922 (Fla. 2d DCA 1986) (police investigating a crime); cf. City of Orlando v. Kazarian, 481 So.2d 506 (Fla. 5th DCA 1985); Jones v. City of Longwood, 404 So.2d 1083 (Fla. 5th DCA 1981) (building inspection and condemnation); Berry v. State, 400 So.2d 80 (Fla. 4th DCA 1981) (acts of judges, state attorneys, and parole and probation commission); Ellmer v. City of St. Petersburg, 378 So.2d 825 (Fla. 2d DCA 1979) (failure to provide adequate police protection); Weston v. State, 373 So.2d 701 (Fla. 1st DCA 1979) (state attorney action); Shoner v. Concord Florida, Inc., 307 So.2d 505 (Fla. 3d DCA 1975) (enforcement of city ordinance).
I would agree, as we expressed in Everton v. Willard, that if a special relationship exists between an individual and a governmental entity, there could be a duty of care owed to an individual; e.g., if the child had been injured while in the protective custody of HRS after a dependency finding. That did not occur in this case.
I have great sympathy for the victim in this case. I fear, however, that, rather than assist abused children, the majority opinion may cause the governing authorities *266 to restrict and limit the activities of HRS in order to avoid this type of liability. To find that the legislature, in enacting section 768.28(1), intended to waive immunity for activities performed only by governmental authorities and not private persons, effectively rewrites section 768.28 by judicial fiat. The majority ignores the legislature's clear intent, expressed in the statute, that 768.28 waives immunity only "under circumstances in which the state or such agency or subdivision if a private person would be liable." We expressly applied that provision in our recent decision in Reddish v. Smith, 468 So.2d 929 (Fla. 1985).
If the Florida Legislature wants to establish a policy requiring the state to pay damages for injuries due to child abuse, it clearly has the authority to do so. The judiciary, however, has no authority to impose that obligation.
McDONALD, C.J., and GRIMES, J., concur.
GRIMES, Justice, dissenting.
An objective analysis of the controlling cases decided since the enactment of section 768.28 leads me to conclude that the judgment should be reversed.
In Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla. 1979), the Supreme Court ruled that the liability of the sovereign would depend on whether the negligent conduct was found to be operational as contrasted with that which was discretionary because it was carried out at the planning level. The Court adopted the four-question test of Evangelical United Brethren Church v. State, 67 Wash.2d 246, 407 P.2d 440 (1965), to aid in determining whether the offending conduct was operational or planning level activity.
Several years later, the Court in Trianon Park Condominium Association, Inc. v. City of Hialeah, 468 So.2d 912 (Fla. 1985), modified the principle of Commercial Carrier Corp. to the extent that, before embarking upon the operational-planning level analysis, it would first be necessary to determine whether or not there was a violation of an underlying common law or statutory duty of care. Quoting from section 768.28, which provides that governmental entities "shall be liable for tort claims in the same manner and to the same extent as a private individual under like circumstances," the Court reasoned that there could be no governmental liability if it arose from a breach of the kind of a duty of care which never existed for private citizens in the first place.
The Court in Trianon placed governmental functions and activities into four categories: (1) legislative, permitting, licensing, and executive officer functions; (2) enforcement of laws and protection of the public safety; (3) capital improvement and property control functions; and (4) providing professional, educational, and general services for the health and welfare of the citizens. For functions and activities falling within the first two categories, the sovereign could not be held liable under any circumstances because these were peculiarly governmental activities which were not carried on by private citizens. It was only with respect to the activities under the third and fourth categories that it became necessary to apply the operational-planning level analysis of Commercial Carrier in order to determine if the sovereign would be held liable.
An example of the application of Trianon is found in the opinion of Reddish v. Smith, 468 So.2d 929 (Fla. 1985), which was issued on the same day as Trianon. In Reddish, a man who was shot by an escaped prisoner sued the Department of Corrections for negligently transferring the prisoner to a minimum custody status from which he escaped. The Court held that even if the conduct complained of could be said to have occurred on the operational level, the decision of the Department of Corrections to place a prisoner in a particular custodial status was an inherently governmental function not arising out of an activity engaged in by private persons. The Court contrasted its ruling with that which would have resulted if a person were injured by the negligent driving of a department employee while transporting prisoners.
*267 If the question in the instant case was limited to the application of the Commercial Carrier analysis, the judgment might be justified because the evidence is sufficient to support the conclusion that the HRS activities in issue were operational in nature. However, under Trianon we cannot reach the operational discretional analysis until we determine into which of the four Trianon categories the HRS activities fall. Clearly, the action of HRS falls within the second Trianon category pertaining to the enforcement of laws and protection of public safety. The powers and duties conferred by law on HRS involve the enforcement of laws regarding child abuse and the protection of children and families of the state. When HRS investigates child abuse referrals and decides the delicate question of whether or not to seek the removal of a child from its parent, HRS is exercising the police power of the state just as much as a deputy sheriff does when he makes the determination whether to arrest a motorist for DUI. See Everton v. Willard, 468 So.2d 936 (Fla. 1985). There was never a common law duty of care with respect to these activities because they were activities carried on only by the government and not by private citizens.
The majority seeks to distinguish Trianon by characterizing the HRS child abuse role as falling within the fourth category which relates to the providing of professional, educational, and general services. However, an analysis of Trianon demonstrates that this category refers to the type of services which are performed by private persons as well as governmental entities and for which common law duties of care already exist. As an example, the Court pointed out that the commission of malpractice by a state medical facility would result in sovereign liability because negligent medical care constitutes a breach of a common law duty, and the rendering of medical services is also provided by private persons.
In summary, under Commercial Carrier, standing by itself, the judgment could be affirmed. However, Commercial Carrier is not the latest expression of this Court on the subject of sovereign immunity. Under Trianon, the actions of HRS with respect to complaints of child abuse unmistakably fall within the category pertaining to the enforcement of laws and the protection of public safety for which there is no waiver of sovereign immunity. Since the statute waiving sovereign immunity has already received so many different interpretations and because Trianon is of such recent vintage, I do not deem it advisable at this point to consider whether we should recede from the principles of Trianon. Of course, many of these problems could be resolved by legislative intervention, but there is nothing to indicate that such relief will be forthcoming.
I respectfully dissent.
OVERTON, J., concurs.
NOTES
[1] Question number four has limited value under Florida's statutory waiver of immunity because the answer will almost invariably be yes unless the government employees, officers, or agents are acting without authority outside the scope of their office or employment. If this is so, they would be personally liable under § 768.28 and the state would be immune because the waiver of immunity would not be applicable.
[2] We also note that it is by no means clear that private persons do not, or could not, perform services such as accepting and investigating reports of child abuse and initiating such court action as necessary to protect the child from further abuse. We need not pursue this point because we rejected the notion that it matters in Commercial Carrier.
[3] Principles of common law duty also support the holding that HRS had a duty of care. We note without extended discussion that the voluntary assumption of responsibilities which might be undertaken by others creates a duty of care on the part of the assuming party. The record here shows that HRS actively discouraged relatives of the infant from further action by warning that unfounded reports of abuse might be subject to criminal action and that the relatives could not interfere with the maternal relationship between the infant and its mother.