944 So.2d 431 (2006)
STATE of Florida, DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Appellant,
v.
Dawn AMORA and Rick Amora, as parents and guardians of Marissa Amora, a minor child, Appellees.
No. 4D05-3346.
District Court of Appeal of Florida, Fourth District.
November 15, 2006.
*432 Kara Berard Rockenbach and Stephen F. Radford of Gaunt, Pratt, Radford, Methe & Rockenbach, P.A., West Palm Beach, for appellant.
Julie H. Littky-Rubin of Lytal, Reiter, Clark, Fountain & Williams, LLP, West Palm Beach, and Marc C. Brotman and Joseph N. Nusbaum of Brotman Nusbaum Fox, Boca Raton, for appellees.
PER CURIAM.
The Department of Children and Family Services (DCF) appeals the trial court's final judgment against DCF finding DCF negligent and awarding the plaintiffs, Dawn and Rick Amora, as guardians and adoptive parents of Marissa Amora, the sum of $26,849,849.06. DCF raises several issues on appeal that we affirm without comment. We address only DCF's argument that the plaintiffs failed to prove a prima facie case of negligence. We affirm the final judgment because the plaintiffs presented competent substantial evidence that DCF was negligent and that the negligence was the proximate cause of the injuries sustained by two-year-old Marissa Amora.
The vast majority of the material facts in this case are undisputed. DCF first became involved in this case on December 9, 2000 when representatives at the Miami Children's Hospital (MCH) called the DCF hotline because Marissa's biological mother failed to come to the hospital on December 8, 2000, the date of the child's discharge. Shirley Arias, the DCF protective investigator assigned to the case, began her formal investigation on December 9, 2000. Arias testified that she was concerned that the mother did not show up to the hospital on the date of Marissa's discharge because she was more interested in getting her boyfriend out of jail, that the mother hardly ever visited or called the hospital while Marissa was hospitalized for a month, that the hospital had difficulty getting the mother to come to the hospital and sign consents, that when the mother did come to the hospital the child would cry and the mother spanked the child in her hospital bed while the child cried, and that the hospital informed Arias that the child did not appear very bonded to the mother. In her testimony, Arias expressed *433 concern because Marissa's x-ray results showed a fractured clavicle, for which the mother had no explanation. Arias also testified that the mother's boyfriend was living with the mother and Marissa, and in her training and experience as a DCF protective investigator, boyfriends who live in the home with the child and are not related by blood or marriage to the child are a safety risk to the child because they are not the child's natural father and have been responsible for abuse situations.
Due to concerns that the mother was not going to be able to provide the necessary follow-up care for her child, Arias, the mother, and Dr. Biehler, the head of the child advocacy team (CAT) at MCH, met at the hospital on December 11, 2000. Dr. Biehler testified that clavicle fractures are usually low risk and not of great concern; however, he was concerned because it was an unexplained injury. Although Dr. Biehler testified that he had no recollection or notes of CAT reporting a concern of physical abuse to DCF, he wrote in his CAT consult that "this is a high risk child who should not be released to home until we can more fully insure that the environment is safe and nurturing." Arias admitted in her testimony that Dr. Biehler advised her that a home study should be completed first before the child was returned to her home. Arias also testified that after meeting with Dr. Biehler, she suspected physical abuse.
Arias then met with her DCF supervisor in Miami, Robert Boyack, because she wanted to share with him her concerns about Marissa. They agreed that the Miami DCF office could not place a hold on Marissa because the Miami office lacked jurisdiction as Marissa was a resident of Lake Worth. They agreed that an out of town inquiry (OTI) was necessary and that the case should be transferred to the Lake Worth DCF office. The following day, on December 12, 2000, Arias received a phone call from Arlene Padilla, a social worker at MCH. Arias informed Padilla that the Miami DCF office would not place a hold on the child, that the child could be released to the mother, and that the Lake Worth DCF office would follow up. However, according to Arias's testimony, Padilla informed her that a hold was appropriate at that time because of all of the concerns regarding the child's safety. Arias testified that she shared these concerns with Padilla.
Arias testified that Padilla then consulted with her supervisor at MCH, and both Padilla and her supervisor called Arias again on December 12, 2000, which was the second phone call that day from Padilla to Arias. Arias testified that Padilla and her supervisor were very concerned with the child being released and that they would feel much more comfortable if they had the name and number of the protective investigator in Lake Worth who would be following up on the case so that they could speak with that person. Ten minutes later, Arias called the DCF office in Lake Worth and was informed that before the case could be reassigned to an investigator in the Lake Worth office, Arias would have to update the computer with all of the information concerning the case. While updating the computer, Arias received a third phone call from Padilla, who again sounded concerned. Arias testified that she had nothing new to tell Padilla because she was still in the process of updating the computer and that no investigator in Lake Worth had been assigned to the case at that point. After completing the update, Arias called DCF in Lake Worth, informing them that the update had been completed, and Arias was given the name of the protective investigator in Lake Worth assigned to do the OTI. Arias testified that she told the Lake Worth office that the case was "urgent" because *434 there were many concerns about the mother's ability to care for the child. Arias also testified that she then called Padilla and informed her that the case had been reassigned and gave her the name of the DCF protective investigator in Lake Worth, Evelyn Diez.
Arias testified that that same day, December 12, 2000, she met with Steve Estes, Boyack's supervisor, and Estes informed Arias that his supervisor received a phone call from the hospital expressing concerns about the child's release. Furthermore, on December 13, 2000, Estes called Arias and informed her that they had two options at that point. First, if the hospital was comfortable, the child could be released to the mother and the case would be followed up in Lake Worth. Second, if the hospital was not comfortable with allowing the child's release, DCF would staff the case with the legal department for the possibility of filing a petition for detention. Because Arias knew that the hospital was not comfortable with allowing Marissa to return home, the case was staffed with legal.
Thereafter, a DCF attorney advised Arias that DCF must complete the following four tasks before the child could be sent home: (1) contact the father of Marissa's half-sister in New Jersey, (2) run criminal checks on the mother and boyfriend, (3) staff the case with the Child Protection Team (CPT), and (4) complete a home study. Arias testified that as of December 20, 2000, she did not contact the father in New Jersey nor did any other witness testify that this task was completed. Evelyn Diez, the DCF investigator in the Lake Worth office, testified that she conducted criminal background checks on the mother and boyfriend, which revealed no criminal records for either the mother or her boyfriend.
As for the CPT review, which is the process of reviewing records and assessing the child by medical professionals to determine abuse, the testimony at trial was that none was completed. Boyack testified that CPT did not do a complete investigation and that the child should not have gone home until CPT did their work. Dr. Biehler also testified that he was not serving in any official capacity as part of a CPT. Dr. Miller, DCF's own retained expert, testified that there was no CPT or equivalent review of this child's medical records to look into the issue of abuse either before she left the hospital on December 15, 2000 or before the child sustained massive brain injuries on January 11, 2001. Dr. Miller agreed that a CPT review of Marissa's available charts and medical history would have shown that Marissa more likely than not was the victim of abusively-inflicted injuries. Furthermore, Dr. Miller agreed that medical information was available before December 15, 2000 that could have allowed the health care professionals to determine that this child had suffered physical injuries of a fractured left clavicle and left scapula due to abuse.
As for the home study, which is the review of the child's living situation, Diez testified that she was never requested to do a home study nor was she told by DCF in Miami that a home study or CPT was required before the child could be sent home. Diez did go to the mother's apartment on December 13, 2000 and noticed that there was no crib, toys, baby clothes, or any evidence of a child living there. However, she admitted that had she completed a home study, she would have spoken with people who were allegedly responsible for watching the child, and most certainly the live-in boyfriend, but she never did. Boyack also testified that a home study was not done in this case. Furthermore, although Estes testified that he was advised on the day of the child's release *435 that there was a positive home study, he conceded that a home study report was never actually completed.
Despite DCF's failure to contact the father, to staff the case with a CPT team, and to conduct a home study, Marissa was released from the hospital on December 15, 2000. It is undisputed that on January 11, 2001, the mother's boyfriend physically abused Marissa and caused her permanent and serious injuries. She sustained traumatic brain and spinal cord injury. Her brain damage prevents her from swallowing properly, and she has weakness in all of her extremities as well as a significant degree of cognitive delay. Furthermore, it is improbable that she will ever be able to walk independently, she will most likely need a feeding tube, and in one doctor's opinion, she will never have the ability to have a meaningful two-way conversation due to the impact on her speech. Marissa also takes numerous medications and requires speech, occupational, and physical therapy five days a week. Her injuries will require her dependency on caregivers for the rest of her life.
The Amoras, who adopted Marissa near the end of 2001, sued for negligence, alleging, inter alia, that DCF negligently failed to adequately and reasonably investigate the matter involving Marissa and that DCF's negligence was the proximate cause of the injuries sustained by Marissa. The jury reached a verdict for the plaintiffs and found DCF 75% responsible for causing Marissa's catastrophic injuries, MCH 20% responsible, and the mother 5% responsible. Final judgment was entered against DCF for $26,849,849.06.
On appeal, DCF argues that the trial court erred in denying its motion for directed verdict because the plaintiffs failed to show that the alleged negligence of DCF was the legal cause of the injuries sustained by Marissa, and that any finding of causation could be based only on a stacking of inferences. According to DCF, the inferences that would need to be stacked to reach a finding of causation are that had DCF completed its investigations, DCF would have uncovered the boyfriend's abuse of Marissa, that the discovery of abuse would have led to Marissa's removal from the mother's custody, and thus, prevented the abuse perpetrated by the boyfriend on January 11, 2001.
The standard of review on appeal of a trial court's ruling on a motion for directed verdict is de novo. See Contreras v. U.S. Sec. Ins. Co., 927 So.2d 16, 20 (Fla. 4th DCA 2006). A motion for directed verdict should be granted only when the evidence viewed in the light most favorable to the non-moving party shows that a jury could not reasonably differ as to the existence of a material fact and that the movant is entitled to judgment as a matter of law. See Brown v. Kaufman, 792 So.2d 502, 503 (Fla. 4th DCA 2001). If there is any evidence to support a possible verdict for the non-moving party, a directed verdict is improper. See id. A jury verdict must be sustained if it is supported by competent substantial evidence. See Richey v. Modular Designs, Inc., 879 So.2d 665, 667 (Fla. 1st DCA 2004).
Concerning DCF's argument that the plaintiffs failed to establish that the alleged negligence was the legal or proximate cause of Marissa's injuries, the issue of proximate cause is generally a question of fact concerned with "whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." Goldberg v. Fla. Power & Light Co., 899 So.2d 1105, 1116 (Fla.2005) (quoting McCain v. Fla. Power Corp., 593 So.2d 500, 502 (Fla.1992)). Where reasonable persons could differ as to whether the *436 facts establish proximate causation, the issue must be left to the fact finder. See id. Furthermore, to constitute proximate cause, there must be such a natural, direct, and continuous sequence between the negligent act and the injury that it can reasonably be said that but for the act the injury would not have occurred. See Bryant v. Jax Liquors, 352 So.2d 542, 544 (Fla. 1st DCA 1977).
After reviewing the record in a light most favorable to the plaintiffs, we conclude that this case was properly submitted to the jury as there is competent substantial evidence in the record to support a finding that DCF's failure to adequately and reasonably investigate the matters involving Marissa foreseeably and substantially caused the injuries sustained by her. The plaintiffs presented evidence that there is a natural, direct, and continuous sequence between DCF's negligence and Marissa's injuries such that it can reasonably be said that but for DCF's negligence, the abuse to Marissa would not have occurred. For example, Arias testified that she suspected physical abuse several days before the child's release, and the Initial Child Safety Assessment form, which Arias completed on December 14, 2000, indicates that it was "suspected" that Marissa exhibited behaviors that may be indicative of abuse or neglect. Arias also testified that in her training and experience as a DCF protective investigator, boyfriends who live in the home with the child and are not related by blood or marriage to the child are a safety risk to the child because they are not the child's natural father and have been responsible for abuse situations. Padilla, the social worker at MCH, testified that she was concerned about the child being released to the mother, and she communicated these concerns to Arias and the Lake Worth office before the child was discharged. As a result of Padilla's concerns, DCF's Legal Department ordered that the child could not go home until four tasks were accomplished. However, the record indicates that three of these tasks were not completed prior to Marissa's release. Both Arias and Boyack testified that Marissa should not have gone home until the tasks were completed, yet DCF failed to prohibit the release of Marissa to her mother.
We find support for our decision in Department of Health and Rehabilitative Services v. Yamuni, 529 So.2d 258, 259 (Fla.1988), where the supreme court affirmed a verdict against the Department of Health and Rehabilitative Services (HRS), now DCF, for negligence. In Yamuni, HRS received numerous reports that the infant was being physically abused. Id. HRS investigated, but the infant was allowed to remain in the custody of its natural mother, and HRS failed to place the infant under protective supervision as it was directed to do by court order in January 1980. Id. In August 1980, the infant was admitted to the hospital with severe burns and two fractures to his arm. Id. The arm was medically amputated the following day. Id. The jury found HRS negligent and returned a verdict of 3.1 million dollars, which was reduced to $50,000 pursuant to section 768.28(5), Florida Statutes. Id. The supreme court affirmed, explaining "whether HRS was actually negligent was a jury question and we are satisfied that the record supports the jury verdict." Id. at 262. The record showed that a court order was entered releasing the infant to his natural mother pending further investigation by HRS, and that the mother had agreed to protective supervision by HRS. Id. HRS conceded that because of an "internal breakdown," it closed the case without assigning it to the protective supervision unit and that the court order was not carried out. Id. The supreme court also explained that "HRS is *437 not a mere police agency and its relationship with an abused child is far more than that of a police agency to the victim of a crime . . . the primary duty of HRS is to immediately prevent any further harm to the child and that the relationship established between HRS and the abused child is a very special one." Id. at 261. Although not specifically addressed in Yamuni, implicit in the supreme court's opinion affirming the verdict is that DCF's negligent failure to place the infant in protective supervision was the proximate cause of his injuries.
Furthermore, we conclude that there is no impermissible stacking of inferences in this case. We find that there is competent substantial evidence that is susceptible to the inference that had DCF adequately and reasonably investigated the matter involving Marissa, the abuse to Marissa would not have occurred. Under the facts of this case, the jury could conclude that DCF's inaction unreasonably exposed Marissa to physical abuse leading to traumatic brain and spinal injury requiring dependency on caregivers for the rest of her life. Dr. Miller, DCF's own expert, agreed that a CPT review of Marissa's available charts and medical history would have shown that Marissa more likely than not was the victim of abusively-inflicted injuries. Furthermore, Dr. Miller agreed that medical information was available before December 15, 2000 that could have allowed the health care professionals to determine that this child had suffered physical injuries of a fractured left clavicle and left scapula due to abuse. This evidence could lead a jury to reasonably conclude that it was foreseeable to DCF that if Marissa was released to her mother without further investigation, she could sustain more abuse.
We conclude that the trial court did not err in denying DCF's motion for directed verdict. The plaintiffs made a prima facie case on the issue of legal causation, which issue was properly submitted to the jury. As the supreme court declared in Yamuni, "HRS [now known as DCF] is not a mere police agency and its relationship with an abused child is far more than that of a police agency to the victim of a crime . . . the primary duty of [DCF] is to immediately prevent any further harm to the child and that the relationship established between [DCF] and the abused child is a very special one." Id. at 261.
Affirmed.
GUNTHER, FARMER and GROSS, JJ., concur.