ALTENBERND, Judge.
 

 The Department of Children and Family Services (DCF) appeals the judgments entered in favor of two families who each claim that a substance abuse counselor licensed by DCF seriously harmed their child. The Chapmans claim that their ten-year-old son committed suicide because of the professional negligence and outrageous misconduct of the counselor, Robert Taylor. The Ruffs claim that their sixteen-year-old daughter suffered mental injuries and severe symptoms of parental alienation due to Mr. Taylor’s misconduct. There is no dispute among the parties that Mr. Taylor’s actions were deplorable and legally actionable and that he should be liable to these families for his extraordinary misconduct.
 

 DCF licensed Mr. Taylor to treat adults with substance abuse problems in 1995. However, DCF did not employ Mr. Taylor or refer the Chapmans or the Ruffs to him for his counseling services. The families maintain that DCF was negligent when licensing him because he submitted false academic credentials and had a prior criminal record in Florida that DCF did not find in its background check. The families maintain that DCF’s negligence continued throughout the 1990s because it failed to adequately investigate complaints about Mr. Taylor, including claims that he was improperly treating minors without a license. The jury found in favor of the families and returned a large verdict against DCF. For purposes of this opinion, we assume that DCF was negligent in licensing Mr. Taylor and that its proper handling of his license would have prevented the suicide of the Chapman’s son and the psychological injuries suffered by everyone in the Ruff household.
 

 The dispositive issue in this case is whether DCF’s statutory duty to license and monitor the activities of substance abuse counselors creates a duty in tort owing to a counselor’s client when a counselor, whom DCF never should have licensed or whose license DCF should have suspended, harms a client who has no relationship with DCF greater than that of any other citizen. We conclude that the role of DCF in this situation involves a governmental regulatory duty to the general public and does not create a duty of care in tort to individual members of the general public. Accordingly, we reverse the judgments on appeal and remand for ' entry of judgment in favor of DCF. Because the case law from the Florida Supreme Court is open to legitimate debate about the status of the “general duty” doctrine, we certify a question of great public importance at the conclusion of this opinion.
 

 I. DCF’S ADMINISTRATION OF THE STATUTORY REGULATIONS REQUIRING LICENSURE OF SUBSTANCE ABUSE COUNSELORS
 

 Chapter 397 of the Florida Statutes is entitled and addresses “Substance Abuse Services.” This body of law is generally administered by DCF.
 
 See
 
 § 397.311(8),
 
 *678
 
 Fla. Stat. (2008).
 
 [1]
 
 The statutes mandate that DCF fulfill a long list of “duties of the department.”.
 
 See
 
 § 397.321. These duties include “[assuming] responsibility for licensing and regulating licensable service components delivering substance abuse services on behalf of service providers.” § 397.321(6).
 

 Any person who wishes to act as a substance abuse service provider must apply to the State, through DCF as the administrating agency, and receive a license.
 
 See
 
 §§ 397.401, .403. Licenses are often issued on a probationary basis and then transformed into regular licenses. § 397.409. Obviously, employees of DCF evaluate the applicants and monitor the licensees, especially during the probationary period. Service providers are subject to background checks, the nature of which has varied considerably since 1994.
 
 See
 
 § 397.451.
 

 Nothing in chapter 397 creates any express cause of action for the benefit of individual members of the public. “Clients” have statutory rights, especially in connection with their relationship with a “service provider,” but these rights appear to create no express legal rights as to DCF that would control the outcome of this case.
 
 See
 
 § 397.501. Indeed, the statutory provision on clients’ rights ends with a limitation of liability and immunity subsection that provides some protection to service providers against civil claims brought by clients.
 
 See
 
 § 397.501(10). That subsection does not appear to address the issue in this case.
 

 II. DCF’S DEFICIENT ADMINISTRATION OF THE STATUTORY REGULATIONS IN THIS CASE
 

 The above-described statutes first became pertinent to this case in 1994 when DCF discovered that Robert Taylor was acting as a substance abuse counselor without a license. Tony Edwards, an employee of DCF who was in charge of licensing counselors in District Six, contacted Mr. Taylor. In December 1994, after some delay, Mr. Taylor came into the DCF offices with his application. Because Mr. Taylor said that he did not intend to treat minors, Mr. Edwards did not perform the more extensive background check required prior to the issuance of such a license. Mr. Taylor sought a “master-level” license, which required completion of a master’s degree from a recognized university. On his application, Mr. Taylor listed a degree from National-Louis University. That school is a recognized university, but Mr. Taylor did not actually graduate from National-Louis University. Mr. Edwards testified that he tided without success to determine whether Mr. Taylor obtained that degree, but he obviously issued a probationary license without confirming this fact or discovering that the application was fraudulent.
 

 In fact, Mr. Taylor not only did not have a master’s degree, he was a convicted felon in Florida. His record included a criminal episode where he defrauded a family by posing as an adoption specialist promising to obtain a baby for the family in exchange for payment. DCF apparently did not become aware of this criminal record until years later.
 

 Despite his promise not to treat minors, Mr. Taylor treated scores of minors. He counseled young girls to go into exotic dancing, stole money from clients, and allegedly caused a client, who was a physician’s daughter, to overdose and almost die.
 

 
 *679
 
 After Mr. Taylor received his license, DCF received several complaints against him, including complaints from licensed doctors, primarily about financial issues. In the fall of 1997, DCF received written reports from a physician that Mr. Taylor was treating juvenile clients. At least in hindsight, it is hard to comprehend how DCF allowed Mr. Taylor to keep his license for this period of time.
 

 The Ruffs took their daughter to Mr. Taylor in December 1997. At the time, she had a very poor relationship with her parents, and Mr. Taylor was one of three counselors that the Hillsborough County Sheriffs Office suggested to the Ruff family. She treated with him until June 1998. Without unnecessarily revealing private details, this court can fairly say that Mr. Taylor tried to bilk money from the Ruff family, told various lies to different family members in order to create animosity among them, and tried to use the animosity to his advantage. The experience caused great harm to all members of the family.
 

 The Chapmans took them ten-year-old son to see Mr. Taylor in 1998. He had an attention deficit disorder, had been acting out, and had symptoms that worsened over time. The Chapmans ran a scuba diving business. One of their customers was a deputy sheriff who checked with the Hills-borough County Sheriffs Office and received Mr. Taylor’s name from them to give to the Chapmans. Again, without unnecessarily discussing private details, the treatment ended on May 10, 1998, when this young boy committed suicide. A psychiatrist testified, without opposition, that the faulty treatment by this eon artist was the cause of the child’s suicide.
 

 Mr. Taylor was prosecuted for his unlicensed activities and is now serving a long prison sentence.
 
 [2]
 
 The two families brought a single, consolidated civil action against DCF and the Hillsborough County Sheriffs Office. The trial court entered summary judgment in favor of the sheriffs office in 2003. The trial court denied DCF’s motion for summary judgment, and the case proceeded to trial in August 2007. The jury returned a verdict in favor of the plaintiffs totaling nearly $6 million. However, the trial court reduced the judgment to $400,000 in light of the statutory limitations on damages against a state agency.
 
 See
 
 § 768.28(5), Fla. Stat. (1997).
 
 [3]
 
 DCF then filed this appeal.
 

 III. A BRIEF HISTORY OF THE DEVELOPMENT OF GOVERNMENTAL LIABILITY LAW IN FLORIDA
 

 Article X, section 13, of the Florida Constitution provides that “[provision may be made by general law for bringing suit against the state as to all liabilities now existing or hereafter originating.” This provision implicitly recognizes that sovereign immunity was the prevailing common law in Florida at the time the constitution was written.
 
 See Alden v. Maine,
 
 527 U.S. 706, 748-49, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (acknowledging that the
 
 common
 
 law established the sovereign immunity of states);
 
 Fla. Dep’t of Health
 
 
 *680
 

 & Rehabilitative Servs. v. S.A.P.,
 
 835 So.2d 1091, 1094 (Fla.2002). The constitution contemplated that the legislature would be empowered to override this common law by a statute of general application. The legislature passed its first general law waiving sovereign immunity in 1973.
 
 See
 
 § 768.28, Fla. Stat. (1973); ch. 73-313, Laws of Fla.
 

 Section 768.28(1) explained that sovereign immunity was waived, “but only to the extent specified in this act.” It further limited this waiver by explaining that actions could be prosecuted against state agencies or subdivisions under circumstances in which the State would be liable if the State were “a private person.”
 
 Id.
 
 Because state agencies and subdivisions perform countless functions that a “private person” is not called upon to perform, lawyers immediately disagreed on whether the legislature had waived sovereign immunity for governmental functions.
 

 In light of the long-standing common law of governmental immunity, there was very limited case law in Florida in the mid-1970s addressing the duties that governmental agencies and employees might owe in tort. For many years, sheriffs had been subject to civil actions for certain mistakes of their deputies.
 
 See, e.g., Mendez v. Blackburn,
 
 226 So.2d 340 (Fla.1969) (reversing summary judgment in favor of sheriffs office and concluding that the evidence presented a jury issue of whether sheriffs office was liable for deputies’ abuse of power after deputies beat plaintiff during arrest);
 
 Holland, for Use & Benefit of Williams v. Mayes,
 
 155 Fla. 129, 19 So.2d 709 (1944) (finding that the Escam-bia County Sheriffs Office could be liable for the death of a constable killed when the sheriff and its deputies tried to apprehend a suspect);
 
 Malone v. Howell,
 
 140 Fla. 693, 192 So. 224 (1939) (noting that sheriffs can be civilly liable for the acts and omissions of their deputies committed by virtue of their offices). This case law, however, primarily concerned intentional torts and had limited usefulness in the analysis of section 768.28.
 

 For the twenty-year period preceding the enactment of section 786.28, municipalities had also been liable in tort for some claims.
 
 See Modlin v. City of Miami Beach,
 
 201 So.2d 70 (Fla.1967);
 
 Hargrove v. Town of Cocoa Beach,
 
 96 So.2d 130 (Fla.1957). Lacking better precedent, the debate surrounding the meaning and scope of section 768.28 tended to center upon these two supreme court decisions discussing municipal liability.
 

 In
 
 Hargrove,
 
 the supreme court had held that a municipal corporation did not have immunity and could be liable for the torts of police officers under the doctrine of respondeat superior similar to a private corporation. 96 So.2d at 133. In
 
 Modlin,
 
 the supreme court narrowed the broadest reaches of
 
 Hargrove,
 
 holding that while generally a municipal corporation had no immunity greater than that of a private corporation, its liability was dependent upon an actionable duty. 201 So.2d at 75. The court then explained the long-existing distinction between duties owed to the general public and those owed to an identifiable individual.
 
 Id.
 
 at 75-76. Because the duty of a building inspector to inspect buildings adequately was regarded as a general duty, the court held that a person who had been harmed by a defect that could have been discovered by an ordinary and reasonable building inspector possessed no cause of action because the municipality did not owe the individual a special duty of care.
 
 Id.
 
 at 76.
 

 The notion that a duty owed to all was a duty owed to none seemed odd to many legal thinkers and had its critics. Thus, when lawyers began to argue that section 768.28 had not waived immunity for mat
 
 *681
 
 ters that fell within the category of “general duties,” the supreme court was quick to respond. In
 
 Commercial Carrier Corp. v. Indian River County,
 
 371 So.2d 1010, 1015 (Fla.1979), Justice Sundberg explained:
 

 First, we believe it to be circuitous reasoning to conclude that no cause of action exists for a negligent act or omission by an agent of the state or its political subdivisions where the duty breached is said to be owed to the public at large but not to any particular person. This is the “general duty” — “special duty” dichotomy emanating from
 
 Mod-lin
 
 ....
 

 Justice Sundberg went on to conclude that this “circuitous reasoning” had “no continuing vitality” after the legislature implemented section 768.28.
 
 Id.
 
 at 1016. Having ended the era of
 
 Modlin,
 
 the supreme court went on to address the question: “What, then, is the scope of waiver contemplated by section 768.28?”
 
 Id.
 
 The long discussion that followed attempted to place section 768.28 in a posture where case law under the Federal Tort Claims Act might be instructive.
 
 Id.
 
 at 1016-17. In rejecting the general-special duty analysis, the court substituted a new approach that sought to determine functions of the government that were “discretionary” and thereby immune from suit.
 
 Id.
 
 at 1022. It summarized its holding as follows:
 

 [W]e, too, hold that although section 768.28 evinces the intent of our legislature to waive sovereign immunity on a broad basis, nevertheless, certain “discretionary” governmental functions remain immune from tort liability. This is so because certain functions of coordinate branches of government may not be subjected to scrutiny by judge or jury as to the wisdom of their performance. In order to identify those functions, we adopt the analysis of
 
 Johnson v. State, supra,
 
 [69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968) ] which distinguishes between the “planning” and “operational” levels of decision-making by governmental agencies. In pursuance of this case-by-case method of proceeding, we commend utilization of the preliminary test iterated in
 
 Evangelical United Brethren Church v. State, supra,
 
 [67 Wash.2d 246, 407 P.2d 440 (1965) ] as a useful tool for analysis.
 

 Id.
 

 The large body of case law that followed the decision in
 
 Commercial Cartier
 
 demonstrates, with all due respect to Justice Sundberg, that the new distinction was no more predictive or adequate than the old general duty-special duty dichotomy.
 
 [4]
 
 Perhaps it was inevitable that, because the new statute “waiv[ed] sovereign immunity,” the initial focus in
 
 Commercial Carti
 
 
 *682
 

 er
 
 centered on waiver of immunity, just as it had in
 
 Hargrove. See
 
 § 768.28(1). This focus tended to blur or obscure the fact that in normal legal analysis, a judge or lawyer would first need to decide what tort duties the State owed before deciding whether the causes of action brought for the breach of those duties were barred or could be avoided under the defense of sovereign immunity.
 

 Just as the supreme court decided that the broad ruling in
 
 Hargrove
 
 needed to be narrowed and explained in
 
 Modlin,
 
 the court engaged in a similar re-examination of
 
 Commercial Carrier
 
 in a series of cases that were argued and decided together.
 
 Trianon Park Condominium Ass’n v. City of Hialeah,
 
 468 So.2d 912 (Fla.1985), was the lead case in this series.
 
 [5]
 
 Notably, Justice Overton, who dissented in
 
 Commercial Carrier,
 
 either wrote or supported the majority opinions in these cases. It is also noteworthy that Justice Sundberg left the bench before the court issued these decisions.
 

 In
 
 Trianon Park,
 
 the court essentially returned to the same issue presented in
 
 Modlin:
 
 whether a municipality could be liable in tort for the negligence of a building inspector.
 
 Id.
 
 at 914. The court reached the same result as it had in
 
 Modlin
 
 with a somewhat different analysis. The court first rephrased the issue before it from one involving the retention of sovereign immunity to one involving the existence of a duty in tort owing to the plaintiffs.
 
 Id.
 
 Then, after discussing the positions of the respective parties in the case, the court noted, “It is apparent from the decisions of the district courts of appeal that the courts and the bar are having difficulty interpreting the purpose of section 768.28 and applying the principles set forth in
 
 Commercial Gamer.” Id.
 
 at 917. Finally, in a lengthy discussion, the court shifted the analysis from concepts of sovereign immunity, as discussed in
 
 Commercial Car-riel-,
 
 to concepts of duties owed by governmental entities in tort.
 
 Id.
 
 at 917-19. The opinion described four categories of governmental activity: “(I) legislative, permitting, licensing, and executive officer functions; (II) enforcement of laws and the protection of the public safety; (III) capital improvements and property control operations; and (IV) providing professional, educational, and general services for the health and welfare of the citizens.” Id. at 919. It gave general guidance concerning the scope of the legal duties in tort arising within these four categories. Id. at 919-22. It then concluded that statutes giving governmental entities discretionary power to enforce laws for the general public do not create causes of action for individual citizens.
 
 Id.
 
 at 922-23.
 

 The majority in
 
 Trianon Park
 
 expressly said that the court was not receding from
 
 Commercial Carrier. Id.
 
 at 923. It also did not suggest that it was returning to the analysis of
 
 Modlin.
 
 However, Justice Ehrlich presented a compelling argument that the court had simply restated the “general duty-special duty” dichotomy in alternative words.
 
 Id.
 
 at 923-26 (Ehrlich, J., dissenting).
 

 Three years later, in
 
 Department of Health & Rehabilitative Services v. Yamuni,
 
 529 So.2d 258 (Fla.1988), the supreme court held that DCF’s predecessor, the Department of Health and Rehabilitative Services (HRS), could be liable for the
 
 *683
 
 negligent failure of a case worker to detect the existence of child abuse after the case worker failed to remove the child from his mother’s care despite numerous abuse reports. After the case worker left the child with his mother, the mother badly burned the child.
 
 Id.
 
 at 259. Yamuni, the child’s adoptive mother, then sued HRS for negligence and recovered a large jury verdict.
 
 Id.
 

 In
 
 Yamuni,
 
 the supreme court’s analysis first focused on sovereign immunity and relied extensively on the
 
 Commercial Car-net
 
 analysis.
 
 Id.
 
 at 259-60. As to the issue of the scope and extent of any waiver of sovereign immunity, the court did not discuss
 
 Trianon Park.
 
 Instead, it discussed
 
 Reddish v. Smith,
 
 468 So.2d 929 (Fla.1985), one of the cases decided at the same time as
 
 Trianon Park. Id.
 
 at 260-61. The court concluded its discussion of
 
 Reddish■
 
 by writing: “We recede from any suggestion in
 
 Reddish
 
 that there has been no waiver of immunity for activities performed only by the government and not private persons. The only government activities for which there is no waiver of immunity are basic policy making decisions at the planning level.”
 
 Id.
 
 at 261 (citing
 
 Com.mercial Carrier,
 
 371 So.2d at 1022). The opinion then engaged in a lengthy discussion of the statutory duties of HRS. Ultimately, the case appears to hold that HRS has a duty in tort to fulfill statutory obligations to prevent child abuse and that a child’s guardian can sue for HRS’s negligence in fulfilling these obligations.
 
 Id.
 
 at 261-62.
 
 Yamuni
 
 classified HRS’s duties as existing under category IV of
 
 Trianon Park
 
 and described the categories as “only a rough guide.”
 
 Id.
 
 at 261.
 

 Finally, in 2004, the supreme court decided
 
 Pollock v. Florida Department of Highway Patrol,
 
 882 So.2d 928 (Fla.2004). In
 
 Pollock,
 
 the court held that the Florida Department of Highway Patrol (FHP) did not have a duty to remove a stalled vehicle from the road for the benefit of users of the highway who were killed when their car collided with the stalled vehicle. Citing
 
 Trianon Park,
 
 the court explained that “[pjatrolling the state highways, controlling the flow of traffic, and enforcing the traffic laws are duties FHP owes to the general public, as opposed to an individual person.”
 
 Id.
 
 at 935. The court then distinguished between duties owed to the general public and “[a] special tort duty” that arises “when law enforcement officers become directly involved in circumstances which place people within a ‘zone of risk.’ ”
 
 Id.
 
 This analysis seems reminiscent of
 
 Modlin,
 
 and Justice Pariente pointed this out in her dissent.
 
 Id.
 
 at 940.
 

 Based on this line of cases, the trial court and the parties below disputed whether DCF could argue that its statutory duties relating to the licensure and discipline of substance abuse counselors involved a “general duty,” for which no tort duty existed, or a statutory obligation generating a duty in tort for which sovereign immunity had been waived. The trial court ultimately decided that, under the analysis in
 
 Yamuni,
 
 the two families stated a cause of action against DCF. In light of the language in
 
 Yamuni,
 
 this ruling was not unreasonable. However, we now conclude that the direct relationship that existed between the child and HRS in
 
 Yamuni
 
 is distinguishable from the distant connection between the Chapmans or the Ruffs and DCF. We conclude that DCF does not owe a duty in tort in the context of this case. However, we admit that the precedent from the supreme court might allow us to reach the opposite result if we focused on the line of cases beginning with
 
 Commercial Carrier
 
 and not upon the somewhat separate line of cases focusing on
 
 Trianon Park.
 

 
 *684
 
 IV. WHEN THE LEGISLATURE PLACES A STATUTORY DUTY TO REGULATE MEMBERS OF A TRADE OR PROFESSION ON AN EXECUTIVE AGENCY, IN THE ABSENCE OF A STATUTORY RIGHT OF ACTION AGAINST THE AGENCY, GENERALLY THE JUDICIARY SHOULD RECOGNIZE NO DUTY IN TORT
 

 The preceding discussion of the development of the case law addressing governmental liability in Florida convinces us that a debatable claim against a governmental agency or subdivision should normally first be examined to determine whether the agency owes a duty in tort. The supreme court’s recent decision in
 
 Wallace v. Dean,
 
 3 So.3d 1035 (Fla.2009), further supports this approach. Only if such a duty exists is it necessary to decide whether the agency retains sovereign, or governmental, immunity to protect it from the claim. It appears to this court that, in most situations, if such a tort duty exists, then governmental immunity is most often waived. Accordingly, if no actionable duty exists under the guidelines in
 
 Trianon Park,
 
 then the parties rarely need to struggle through the difficult analysis of
 
 Commercial Gamer
 
 to determine whether the governmental conduct falls within the ambit of a discretionary decision immune from suit. In performing this analysis, it is important to identify the issue in the case as precisely and narrowly as possible because the case law tends to use the rules in
 
 Commercial Carrier
 
 and
 
 Trianon Park
 
 as rough guidelines only.
 

 In this case, the dispositive issue is whether DCF’s statutory duty to license and monitor the activities of substance abuse counselors created a duty in tort when a counselor, whom DCF never should have licensed or whose license DCF should have suspended, harms a client who has no relationship with DCF greater than that of any other citizen. It is important to observe that in this context DCF is an executive agency fulfilling regulatory duties established by the legislature. Thus, there are no common law duties involved in this case or duties that seem even comparable to common law duties.
 
 [6]
 

 When the legislature creates a regulatory statute that does not expressly create a private right of action against the private individuals who are regulated by the statute, the courts have been cautious about concluding that the statute creates a private right of action against them.
 
 See Murthy v. N. Sinha Corp.,
 
 644 So.2d 983 (Fla.1994);
 
 Miulli v. Fla. High Sch. Athletic Ass’n,
 
 998 So.2d 1155 (Fla. 2d DCA 2008). In this case, the question is similar — whether the legislature intended to create a private right of action against a governmental agency that is tasked with regulating the private individual.
 

 When the legislature decides to create regulatory duties for the executive branch to fulfill, there are good reasons for the judiciary to hesitate to assume that the legislature intended to create a duty that is actionable against the executive agency. The first, and most obvious, reason is that the legislature is free to expressly create such a duty within the statutory enactment if it determines that private lawsuits would be beneficial to achieving the goals that the regulatory process was created to achieve.
 

 
 *685
 
 The second reason is equally important — although more complex to explain— and relates to the broad deference that courts have always recognized for public policy decisions within the legislative process. In short, the judiciary significantly alters the economic justification for a regulatory statute when it creates a duty in tort from a statutory requirement. There are valid reasons to allow the legislature alone to decide whether it is cost-effective to impose a level of liability on a government agency that negligently performs a statutory requirement.
 

 When the legislature decided to license and regulate substance abuse counselors, it clearly had a valid health and safety reason to create the statute requiring such regulation.
 
 See
 
 § 397.305(2) (asserting that the act’s purpose is “to provide for a comprehensive continuum of accessible and quality substance abuse prevention, intervention, and treatment services”). The legislative process is often somewhat intuitive, but the legislature clearly concluded that unlicensed substance abuse counselors were, or would become, a cost to society that could be reduced by regulation. In this case, for example, it is obvious that a single rogue counselor caused damage that, measured in dollars, is very high.
 

 As an example, assume hypothetically that the legislature estimated that unlicensed practitioners within an unregulated business cost the public $100 million in damages annually. Then, after studying the issue, the legislature concluded that creating a regulatory process administered by an executive agency would cost $10 million and prevent $50 million in damage to the public. The legislature might reasonably enact and fund such a statutory scheme regulating the business and its practitioners because doing so would save the public $40 million annually.
 

 However, if the judiciary decided to transform these statutory duties into tort duties, then the executive agency administering the statutes would be subject to suit each time it negligently licensed a practitioner or failed to suspend a license. As a result, a sizable portion of the $50 million in costs that the program was unable to prevent would be transformed into contingent liabilities of the administering agency.
 
 [7]
 
 The regulatory program with a budget of $10 million would suddenly need to increase its budget to cover the costs associated with this additional $50 million in contingent liability.
 

 This scenario makes it unlikely, or at least less likely, that the legislature would pass an otherwise beneficial statute aimed at regulating the business because the legislature would hesitate to expose the administering agency to unforeseen and uncontrollable liability for the damages the regulation failed to prevent.
 
 [8]
 
 In economic terms, such a judicial ruling takes an external cost, or externality of the regulated business, and transforms it into a cost for all taxpayers to bear instead of an internalized cost for the regulated business to bear.
 
 [9]
 

 
 *686
 
 Given that it is appropriate for the legislature to decide independently if a regulatory process is cost-effective, the judiciary interferes in that process when it creates duties in tort from statutory requirements without the legislature’s expressly authorizing a private right of action. Tort law is often justified as a method to impose costs on defendants, such as businesses that create defective products or landowners who create dangerous conditions, in order to minimize the total social costs of these activities. If tort law is, in part, designed to make our government and our society run with greater economic efficiency, then it should encourage, rather than discourage, the legislative process by which we as a society decide to regulate activities that generate social costs. If courts, by imposing government tort liability for the negligent implementation of regulatory statutes, cause the legislature not to enact beneficial regulatory statutes, then tort law is performing a task completely opposite of its intended function.
 

 This economic reasoning, at least in the context of governmental regulation, explains why a statutory “duty to, all” should generally be a duty to none in tort. In this situation, the judiciary normally should allow the legislature to decide whether the regulations will work better, or reduce the cost to the public, if the governmental agencies implementing the regulations have some degree of risk associated with failing to act with reasonable care. In the words of the constitution, when it comes to the field of executive agencies regulating trades and professions, the liabilities' “hereafter originating” should typically originate in the legislature. Art. X, § 13, Fla. Const.
 

 Accordingly, under the general guidelines provided in'
 
 Trianon Park,
 
 we hold that the statutory duties of DCF in section 897.321 are general duties owing to the public and that, at least without some special relationship that would justify a specific member of the public’s relying upon DCF, these statutes do not create an actionable duty that would permit the families to recover in this case. Accordingly, we reverse the judgment on appeal and remand for the entry of judgment in favor of DCF.
 

 Y. CERTIFIED QUESTION
 

 Because this area of the law is still somewhat unpredictable in light of the case law discussed in section III and because it affects both the legislature in its decision to enact regulatory statutes and the members of the public in understanding their rights against governmental regulatory agencies, we certify the following question of great public importance, which we believe to be dispositive in this case:
 

 AFTER THE LEGISLATURE CREATED A STATUTORY DUTY REQUIRING DCF TO LICENSE AND MONITOR THE ACTIVITIES OF SUBSTANCE ABUSE COUNSELORS, DOES A DUTY IN TORT ARISE, OWING BY DCF TO A COUNSELOR’S CLIENT:
 

 (1) WHEN DCF NEGLIGENTLY LICENSES THE COUNSELOR,
 

 (2) WHEN THE COUNSELOR HARMS A CLIENT, AND
 

 (3) WHEN THE CLIENT HAS NO RELATIONSHIP WITH DCF
 
 *687
 
 GREATER THAN THAT OF ANY OTHER CITIZEN?
 

 Reversed and remanded.
 

 DAVIS and VILLANTI, JJ., Concur.
 

 [1]
 

 . The statutes in effect at the time of these events would have been the statutes applicable between 1994 and 1998. We use the current statutes in this section of the opinion because the dispositive issue is not affected by any changes in the statutes.
 

 [2]
 

 . The records of the Department of Corrections reflect that Mr. Taylor is serving a prison sentence for organized fraud and multiple counts of grand theft and is not expected to be released from prison until 2095, assuming he lives to be 141 years old. Florida Department of Corrections, http://www.dc.state.fl.us/ ActiveInmates/detail.asp?Bookmark= 17& From=list&SessionID=648984716 (last visited Feb. 25, 2009).
 

 [3]
 

 . The two families have challenged this amount on cross-appeal, claiming that the lawsuit involves a larger number of claims. In light of our result in this opinion, we do not reach the cross-appeal.
 

 [4]
 

 .
 
 See, e.g., Davis v. State, Dep’t of Con.,
 
 460 So.2d 452 (Fla. 1st DCA 1984) (certifying the question of whether the Department of Corrections' inmate classification is a discretionary function entitling the State to sovereign immunity);
 
 Broward County v. Payne,
 
 437 So.2d 719, 721 (Fla. 4th DCA 1983) (noting the courts' continuing “uncertainty as to the delineation between operations and planning” level governmental functions);
 
 Ralph v. City of Daytona Beach,
 
 412 So.2d 875 (Fla. 5th DCA 1982) (disputing whether the city’s decision to undertake traffic control on its beaches is a planning level function entitling the city to sovereign immunity),
 
 quashed,
 
 471 So.2d 1 (Fla. 1983);
 
 Ingham v. State, Dep’t of Transp.,
 
 399 So.2d 1028 (Fla. 1st DCA 1981) (Shaw, J., dissenting) (arguing that the trial court improperly dismissed the plaintiff's complaint because the State’s construction, maintenance, and repair of a state road is an operational level activity that is not within the State's sovereign immunity);
 
 Bellavance v. State,
 
 390 So.2d 422 (Fla. 1st DCA 1980) (determining that the decision to release an involuntarily-committed patient from a state mental hospital was not a "discretionary” decision that allowed the State to invoke sovereign immunity).
 

 [5]
 

 . The other cases were
 
 Reddish v. Smith,
 
 468 So.2d 929 (Fla.1985);
 
 Everton v. Willard,
 
 468 So.2d 936 (Fla.1985);
 
 Carter v. City of Stuart,
 
 468 So.2d 955 (Fla.1985);
 
 Duvall v. City of Cape Coral,
 
 468 So.2d 961 (Fla.1985);
 
 City of Daytona Beach v. Huhn,
 
 468 So.2d 963 (Fla. 1985); and
 
 Rodriguez v. City of Cape Coral,
 
 468 So.2d 963 (Fla.1985).
 

 [6]
 

 . For example, the parties have cited no case that places a duty in tort upon a voluntary private organization that issues '‘certifications” or other credentials claiming that doctors or lawyers or other highly trained professionals have a special level of proficiency. This case is distinguishable from cases in which a governmental agency is liable due to the "undertakers doctrine.”
 
 See Wallace v. Dean,
 
 3 So.3d 1035 (Fla.2009).
 

 [7]
 

 . Justice Overton opined that creating new duties of care and tort liabilities after the legislature enacted regulatory laws “would, in effect, make the governments and their taxpayers virtual insurers of the activities regulated.”
 
 Trianon Park,
 
 468 So.2d at 922.
 

 [8]
 

 .
 
 See id.
 
 at 922-23 (arguing that creating tort liability when government enacts and enforces laws "would result in a substantial fiscal impact on governmental entities which was never intended by the legislature,” constrain the development of new programs, and reduce government regulations intended to protect the public).
 

 [9]
 

 .By way of a more concrete example, if the legislature wished to internalize the public costs of substance abuse counselors, one method would be to require the counselors to
 
 *686
 
 purchase liability insurance to cover these claims. This approach gives the counselors an economic incentive to provide services competently, which in turn reduces the costs. Simply passing these costs on to the taxpayers through lawsuits against the regulating agency is, in all likelihood, a far less efficient approach to cost avoidance in this scenario.